IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         **Plaintiff**,<br><br>v.<br><br>PAVLOS KARAGIANIS (01),<br><br>         **Defendant**. | Case No. 22-20051-01-DDC |

## MEMORANDUM AND ORDER

  Before the court is defendant Pavlos Karagianis's Motion to Suppress Evidence (Doc. 59). Mr. Karagianis moves the court to suppress all evidence secured when law enforcement executed a search warrant on his hotel rooms. Hours before the search, police arrested Mr. Karagianis on an unrelated and outstanding state warrant. He then posted bond, securing his release from custody. He contends that law enforcement—in the 19 hours between his release from police custody on bond and the search warrant's execution—prohibited him from returning to his hotel rooms. And, he argues, that prohibition constituted an unlawful seizure which taints the later hotel room search and implicates the exclusionary rule. So, Mr. Karagianis asks the court to suppress all evidence secured during the allegedly tainted search.

  The government responds that law enforcement didn't prohibit Mr. Karagianis's return to his hotel rooms. And, the government argues, even assuming law enforcement did prohibit his return, Mr. Karagianis still hasn't alleged facts sufficient to justify suppression. The government asserts two reasons why even Mr. Karagianis's version of the alleged facts fall short. *First*, law

enforcement didn't perpetrate an unlawful seizure. The Fourth Amendment permits reasonable seizures. And courts have held a seizure to prevent destruction of evidence—like the seizure alleged here—is reasonable. Such a seizure thus doesn't violate the Fourth Amendment or taint the subsequent search. *Second*, and even if law enforcement's alleged seizure violated the Fourth Amendment, the search warrant constituted an independent source of a lawful reason that removes any taint. With any potential taint removed, police thus conducted the search under a valid warrant and lawfully secured the evidence. And so, the court shouldn't suppress the evidence secured.

The court agrees with the government and denies Mr. Karagianis's Motion to Suppress. The court explains its decision by reciting, first, the relevant background facts. Then, the court assumes law enforcement did prohibit Mr. Karagianis from returning to his hotel rooms and concludes doing so didn't violate the Fourth Amendment. Next, the court assumes law enforcement violated the Fourth Amendment and determines the court still shouldn't suppress the evidence under an independent source theory. Finally, the court explains why it elected not to conduct an evidentiary hearing, before reciting its conclusions.

## I.   Background

The court derives the following factual findings from the briefs submitted on this motion. Where the parties dispute the facts, the court construes the facts in the light most favorable to Mr. Karagianis. That is, whichever facts tend to suggest a constitutional violation, or increase the intensity of such a violation, the court accepts those facts as true. As explained in Part IV, the court elected not to conduct an evidentiary hearing to resolve these disputed facts because, in the end, resolving them doesn't affect the outcome. Neither version of the facts justifies suppression.

### *The White Audi, the Controlled Buys, and Mr. Karagianis's Hotel*

On August 18, 2022, the Jackson County (Missouri) Drug Task Force (JCDTF) conducted a controlled buy at the Bass Pro Shop in Independence, Missouri.  Doc. 61 at 2.  According to GPS location data, Mr. Karagianis attended this controlled buy.  *Id.*  The seller at the buy, Glendy Garcia-Caballero, also confirmed Mr. Karagianis's presence there.  *Id.*  She told the Confidential Informant (CI) that her boyfriend—later identified as Mr. Karagianis—was driving the white Audi in which she had arrived.  *Id.*

On September 7, 2022, that same white Audi was parked outside the Extended Stay Hotel in Merriam, Kansas, shortly before a second controlled buy took place.  *Id.*  Mr. Karagianis rented two rooms at the Extended Stay, Rooms 128 and 279.  *Id.* at 4.  On that day, a detective observed Mr. Karagianis enter the white Audi.  *Id.* at 2.  Mr. Karagianis then travelled to Walmart in the white Audi, where the detective photographed him.  *Id.*  Mr. Karagianis then returned the vehicle to the Extended Stay Hotel.  *Id.*  Thirty minutes later, the second controlled buy took place.  *Id.*

### *The White Audi, the Black Kia Optima, and the I-70 Arrests*

The next day, September 8, 2022, Kansas Highway Patrol (KHP) Troopers stopped the same white Audi en route from Denver.  *Id.* at 3.  KHP Troopers arrested Jennifer Hidalgo, driver, and Ms. Caballero, passenger, and seized approximately 31.6 pounds of methamphetamine from the Audi's rear seat.  *Id.*  JCDTF had provided the KHP with information about suspected drug trafficking involving the white Audi traveling from Denver that day.  *Id.* at 2–3.  At the arrest, officers observed that a black Kia Optima was following the Audi as it travelled.  *Id.* at 3.  Officers later learned—from the Optima's driver—that her vehicle was back up, in case the white Audi broke down in transit.  *Id.*

### *Ms. Hidalgo's Interview and Mr. Karagianis's Hotel*

After Ms. Hidalgo's arrest, FBI Special Agent Ruben Ortega and JCDTF detective Todd Boly interviewed Ms. Hidalgo. *Id.* at 3–4. In the interview, Ms. Hidalgo said that Mr. Karagianis previously provided her with methamphetamine—which she then sold—from his Extended Stay hotel rooms, most recently on September 1, 2022. *Id.* at 4. Ms. Hidalgo also recounted that she had met with Mr. Karagianis at the Extended Stay Hotel on September 7, 2022. *Id.* And, at that time, she "saw a white crystal-like substance, suspected to be methamphetamine, about the size of a burrito wrapped in plastic." *Id.* The same day, she also saw Mr. Karagianis loading a large amount of cash (about $32,000) into the white Audi's trunk. *Id.* She explained that she had come to the Extended Stay Hotel to meet Mr. Karagianis because he had asked if she wanted to travel to Denver. *Id.* At their meeting's end, Mr. Karagianis and Ms. Caballero instructed Ms. Hidalgo to drive to Denver and pick up drugs. *Id.* Ms. Hidalgo also showed law enforcement a text message from Mr. Karagianis telling her in which room she should meet him. *Id.*

### *Mr. Karagianis's Arrest and Release*

During Ms. Hidalgo's interview, law enforcement set up surveillance at Mr. Karagianis's hotel.[1] *Id.* Officers observed Mr. Karagianis walking between rooms 128 and 279. *Id.* At approximately 3:55 p.m., the black Kia Optima—which had accompanied the white Audi from Denver—arrived at the Extended Stay. *Id.* The driver, C.D., entered one of defendant's hotel rooms (Room 128). *Id.* A little while later, C.D., Mr. Karagianis, and an unknown female left

---

[1]   The government contends this surveillance was "constant," beginning at 1:00 p.m. on September 8, 2022 until law enforcement executed the search warrant at approximately 1:22 p.m. on September 9, 2022. Doc. 61 at 6. Mr. Karagianis calls into question the "constant" nature of the surveillance. Doc. 65 at 3. He argues that constant surveillance "is unlikely given that . . . the hotel turned off key card access to the rooms by 10:00 p.m." on September 8, 2022. *Id.* The court concludes that resolving this factual dispute is irrelevant to this motion's outcome. Neither contention would change the court's analysis.

Room 128 and entered the black Optima. *Id.* at 4–5. At that point, about 4:15 p.m., Merriam Police Department Officer Trey Daniels arrested Mr. Karagianis on an outstanding city traffic warrant and took him into custody. Doc. 59 at 2.

Mr. Karagianis posted bond and left the police station two hours after being arrested.[2] *Id.* According to Mr. Karagianis, Officer Daniels, "acting in concert with federal agents," prohibited him from returning to his hotel rooms upon his release. *Id.* Mr. Karagianis asserts that Officer Daniels (or another Merriam Police Officer) informed Mr. Karagianis that he wasn't allowed to return to the rooms. Doc. 65 at 2. The government disputes this contention and states, to the contrary, that Officer Daniels didn't prevent Mr. Karagianis from accessing the hotel rooms after his release. Doc. 61 at 7. They aver that Officer Daniels didn't interact with Mr. Karagianis upon his release at all.[3] *Id.* In either case, Mr. Karagianis made no attempt to access the hotel rooms after his release. Doc. 65 at 2.

### *The Search Warrant*

On September 8, 2022, after the post-arrest interview of Ms. Hidalgo, law enforcement started drafting affidavits for a search warrant of Mr. Karagianis's hotel rooms and in support of

---

[2]   The parties disagree about the timeline. Mr. Karagianis asserts that he "posted bond and was released from the police station" two hours after arrest. Doc. 59 at 2. If accurate, the time between his release at 6:15 p.m. on September 8, 2022, and law enforcement executing the search warrant at 1:20 p.m. on September 9, 2022, was approximately 19 hours. The government contends that Mr. Karagianis secured his release at 10:00 p.m., putting the alleged seizure period at 15 hours. Doc. 61 at 6. The court adopts Mr. Karagianis's nineteen-hour timeline because it establishes the longer version of any alleged seizure. The court notes, however, that Mr. Karagianis's Reply acknowledges a range for his release from custody—between 6:15 p.m. and 10:00 p.m., Doc. 65 at 3,—in contrast to the definitive "[t]wo hours after being arrested" asserted in his motion, Doc. 59 at 2.

[3]   Mr. Karagianis asserts that this factual dispute alone suffices to warrant an evidentiary hearing. Doc. 65 at 2. But the court's analysis of his motion accredits Mr. Karagianis's version of the facts and assumes that an officer *did* inform Mr. Karagianis that he couldn't return to his hotel rooms after his release. Again, the court takes all the alleged facts in the light most favorable to Mr. Karagianis. As explained in Part IV, an evidentiary hearing to resolve these disputed facts remains unnecessary. Even with Mr. Karagianis's facts in play, those facts don't warrant suppression of the secured evidence.

a complaint supporting Ms. Hidalgo and Ms. Caballero's arrests. Doc. 61 at 5. Law enforcement completed and submitted initial drafts to the U.S. Attorney's Office at approximately 7:48 p.m. *Id.* They submitted revised drafts at 11:53 p.m. *Id.* at 5–6.

At 10:23 a.m. the next morning, September 9, 2022, law enforcement emailed an advance copy of the search warrant affidavit to U.S. Magistrate Judge Teresa James's chambers, followed by a signed copy at 10:42 a.m. *Id.* at 6. Magistrate Judge James arranged an appointment for 12:45 p.m. to swear out the warrant. *Id.* At 12:51 p.m., Magistrate Judge James signed and issued a search warrant for Mr. Karagianis's Extended Stay hotel rooms (128 and 279). Doc. 59 at 1. Law enforcement executed that search warrant on Mr. Karagianis's rooms at 1:20 p.m., at most nineteen hours after Mr. Karagianis's release. *Id.* at 1, 3.

With this factual background controlling its analysis, the court now considers whether these facts demonstrate that law enforcement unreasonably seized Mr. Karagianis's hotel rooms, thus violating the Fourth Amendment.

## II.     Fourth Amendment Violation

Mr. Karagianis asserts, first, that the Fourth Amendment protects a guest in a hotel room against unreasonable searches and seizures and law enforcement unreasonably seized his hotel room. *Id.* at 3. He contends that law enforcement's act of preventing his return to his hotel rooms violated his expectation of privacy for 19 hours, until officers secured a search warrant. *Id.* So, he argues that law enforcement officers violated the Fourth Amendment, and their violation justifies suppression of the evidence later secured during a search of the rooms. *Id.*

The government responds that—even if law enforcement had prohibited Mr. Karagianis's return to his hotel rooms, and even if that prohibition counts as a seizure—such a seizure is permissible to prevent the destruction of evidence. Doc. 61 at 8. So, the government argues, the

6

seizure—even if one occurred—doesn't violate the Fourth Amendment. The court agrees with the government.

According to the Supreme Court, "a Fourth Amendment 'seizure' occurs 'when there is some meaningful [government] interference with an individual's possessory interests in . . . property.'" *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018) (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 104 (1984)). But "not every seizure at the hands of government officials violates the Fourth Amendment. Only unreasonable seizures are proscribed." *Id.* at 1230. The court doesn't employ "a *per se* rule of unreasonableness," but, instead, must "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Illinois v. McArthur*, 531 U.S. 326, 331 (2001).

The Supreme Court applied such a balancing of concerns in its seizure analysis in *McArthur*. *Id.* There, police were on-site for a civil standby at a trailer home when they learned that the trailer likely contained drugs. *Id.* at 328–29. One officer left to seek a search warrant while the other officer stayed on-site and—fearing destruction of evidence—refused to let the trailer home's occupant re-enter the trailer unsupervised. *Id.* at 329. Two hours later, search warrant in hand, the officers searched the trailer and discovered marijuana and paraphernalia. *Id.* The defendant moved to suppress the drugs and paraphernalia "on the ground that they were the 'fruit' of an unlawful police seizure, namely, the refusal to let him reenter the trailer unaccompanied[.]" *Id.*

Holding the seizure reasonable, the Supreme Court discussed four "circumstances" supporting reasonableness, all centering on the police at the scene. *Id.* at 331. The police: (i) "had probable cause to believe" the trailer "contained evidence of a crime and contraband[;]" (ii) "had good reason to fear" destruction of the evidence before the warrant's arrival; (iii) "made

7

reasonable efforts to reconcile" law enforcement needs with personal privacy demands; and (iv) "imposed the restraint" over a limited duration. *Id.* at 331–32. Considering these four circumstances "in combination," the Court held the seizure both "reasonable" and "permissible[.]" *Id.* at 331–33.

The Court based its conclusion, in part, on *Segura v. United States*, 468 U.S. 796, 810 (1984). The seizure at issue in *Segura* lasted considerably longer: 19 hours as opposed to two hours in *McArthur*. *Id.* at 812–13. And the officers in *Segura* seized the apartment by entering and remaining in it—instead of refusing re-entry and staying outside—while awaiting the warrant. *Id.* at 800–01. Nonetheless, *Segura* held that the "seizure did not violate the Fourth Amendment." *Id.* at 799. The Court explained "that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Id.* at 810.[4] To qualify as reasonable, such a seizure "must be of a temporary duration" and, during that time, requires "law enforcement to act diligently in obtaining a search warrant[.]" *Harris v. Barnes*, No. 19-CV-00572, 2021 WL 5850891, at *13 (D. Colo. Dec. 8, 2021), *aff'd sub nom. Harris v. City & Cnty. of Denver*, No. 22-1007, 2023 WL 395742 (10th Cir. Jan. 25, 2023); *see also McArthur*, 531 U.S. at 332 ("[T]his time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.")

---

[4]   *See also Harman v. Pollock*, 586 F.3d 1254, 1266 (10th Cir. 2009) (citing *Segura*, 468 U.S. at 812, and recommending as the preferred course that officers—when fearing destruction of evidence— "secure[] the residence while waiting for a proper warrant"); *Harris v. Barnes*, No. 19-CV-00572, 2021 WL 5850891, at *13 (D. Colo. Dec. 8, 2021), *aff'd sub nom. Harris v. City & Cnty. of Denver*, No. 22-1007, 2023 WL 395742 (10th Cir. Jan. 25, 2023) ("Law enforcement may 'seize' a dwelling until a search warrant can be obtained.").

Applying the Court's four circumstances in *McArthur* to this case, the court concludes the seizure here—assuming one occurred—was reasonable. The court begins its reasonableness analysis with the first *McArthur* circumstance—probable cause.

### 1. Probable Cause

The police had probable cause to believe Mr. Karagianis's hotel rooms "contained evidence of a crime and contraband[,]" specifically methamphetamine, because of Ms. Hidalgo's post-*Miranda* statements in her interview with officers, as well as independent law enforcement observations. *McArthur*, 531 U.S. at 331. Mr. Karagianis challenges such a determination of probable cause here, however, questioning Ms. Hidalgo's reliability as an informant.[5] Doc. 65 at 5–6.

"Probable cause refers to a probability or substantial chance of criminal activity based on the commonsense and practical considerations of everyday life." *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014) (internal citations, quotation marks, and brackets omitted). When an informant provides the basis for probable cause, the Supreme Court has disavowed any "rigid demand" for the informant to satisfy specific tests of "veracity," "reliability," and "basis of knowledge[.]" *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983). While acknowledging the importance of these characteristics, the Court embraced a totality-of-the-circumstances approach. *Id.* at 233; *see also Pulliam*, 748 F.3d at 971 ("When assessing probable cause, we look to the totality of the circumstances[.]"). These three characteristics are "intertwined" and "not absolute, independent requirements that must be satisfied in order for probable cause to exist[.]"

---

[5] First, Mr. Karagianis notes a discrepancy between Ms. Hidalgo's recollection of the last date on which she picked up methamphetamine from Mr. Karagianis's Room 279 (September 1, 2022) and the date when Mr. Karagianis rented Room 279 (September 3, 2022) as noted by FBI Special Agent Ruben Ortega in his Affidavit. Doc. 65 at 5. Then, he contends that no evidence suggested controlled buys occurred in his hotel rooms. *Id.* And finally, he argues, Ms. Hidalgo's statements contained "no indicia of trustworthiness, nor had she provided any prior accurate tips to police[.]" *Id.* at 6.

9

*United States v. Quezada-Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009) (citation and internal quotation marks omitted).

*Gates* also explained how to assess an informant with doubtful motives: "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." 462 U.S. at 234. And, finally, "sufficient independent corroboration of the informant's information" tempers the need "to consider the informant's reliability." *United States v. Lynch*, No. 21-CR-0393, 2022 WL 822157, at *3 (N.D. Okla. Mar. 18, 2022) (citing *United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000)).

Here, Ms. Hidalgo identified Mr. Karagianis's hotel rooms as a previous locale where she had picked up methamphetamine to sell. Doc. 61 at 4. She also claimed to have seen "a white, crystal-like substance, suspected to be methamphetamine, about the size of a burrito wrapped in plastic" in Mr. Karagianis's hotel room on September 7, 2022—the day before police initiated the alleged seizure. *Id.* And she supported this statement by showing investigators a text message from Mr. Karagianis telling her the hotel room number where she should meet him. *Id.* Finally, she said that Mr. Karagianis instigated her trip to Denver to pick up methamphetamine, using the white Audi, and that she saw him load the Audi's trunk at the Extended Stay Hotel with approximately $32,000 just before she drove to Denver. *Id.*

These statements provide both a "detailed description of alleged wrongdoing" and "a statement that the event was observed first-hand[.]" *Gates*, 462 U.S. at 234. Ms. Hidalgo described the suspected drugs' size and color as well as the amount of cash, placed in the white Audi in the Extended Stay Hotel's parking lot. She also stated that she observed both the drugs and the money transfer first-hand. So, the court affords her interview statements "greater weight

10

than might otherwise be the case." *Id.* Examining "the totality of the circumstances[,]" the court concludes Ms. Hidalgo's interview statements support a "substantial chance of criminal activity" occurring in Mr. Karagianis's hotel rooms. *Pulliam*, 748 F.3d at 971 (citation and internal quotation marks omitted).

And, even if the court credits Mr. Karagianis's suspicion about Ms. Hidalgo's reliability, law enforcement independently observed Mr. Karagianis interacting with the relevant vehicles in ways that sufficiently corroborate Ms. Hidalgo's statements. To begin, Mr. Karagianis apparently attended a controlled buy, on August 18, 2022, involving the white Audi. Doc. 61 at 2. Two facts suggest his presence at this controlled buy. *First*, Mr. Karagianis's GPS location tracker put him at the Bass Pro Shop in Independence, Missouri at the time of the controlled buy. *Id. Second*, Ms. Caballero's statement to the CI that her boyfriend drove the white Audi located him there as well. *Id.* Later in the investigation, Ms. Caballero referred to Mr. Karagianis as her boyfriend. *Id.*

Law enforcement officers also saw Mr. Karagianis interacting with both the white Audi and the black Kia Optima at the Extended Stay Hotel at points close in time to the vehicles' involvement with illegal drugs. Thirty minutes before a second controlled buy on September 7, 2022, law enforcement observed Mr. Karagianis enter, travel in, and leave the white Audi in the Extended Stay Hotel's parking lot. *Id.* And law enforcement officers observed Mr. Karagianis enter the black Kia Optima—which had travelled with the white Audi on the methamphetamine run to Denver and back—in the Extended Stay Hotel's parking lot just hours after they arrested Ms. Hidalgo and Ms. Caballero. *Id.* at 4–5.

Law enforcement's observations connecting these two vehicles to Mr. Karagianis and to the Extended Stay Hotel provide "sufficient independent corroboration" of Ms. Hidalgo's

11

interview statements. *Lynch*, 2022 WL 822157, at *3. These observations and statements suggest a "substantial chance of criminal activity" in the hotel rooms. *Pulliam*, 748 F.3d at 971 (citation and internal quotation marks omitted). Considering the "totality of the circumstances[,]" *id.*, the court concludes the officers had probable cause to believe that Mr. Karagianis's hotel rooms "contained evidence of a crime and contraband[,]" *McArthur*, 531 U.S. at 331.

And so, the first *McArthur* circumstance favors the reasonableness of the seizure. The court turns next to the second *McArthur* factor—likelihood of evidence destruction.

### 2. Destruction of Evidence

Police "had good reason to fear" the destruction of evidence before the warrant's arrival. *Id.* at 332. Law enforcement observed Mr. Karagianis interact with C.D., the driver of the black Kia Optima, at the Extended Stay Hotel shortly after Ms. Caballero and Ms. Hidalgo's arrests. *See* Doc. 61 at 4–5. And the black Optima was following the white Audi when KHP Troopers stopped the Audi and arrested Ms. Caballero and Ms. Hidalgo. *Id.* at 3. So, officers reasonably could conclude that C.D. had warned Mr. Karagianis about law enforcement officers' involvement with the Denver methamphetamine run. This warning might have prompted him, given the opportunity, to destroy evidence of drug trafficking found in his hotel rooms. This circumstance, too, points to reasonableness, as does the third circumstance, addressed next.

### 3. Law Enforcement Needs and Personal Privacy Demands

Police "made reasonable efforts to reconcile" law enforcement needs with personal privacy demands. *McArthur*, 531 U.S. at 332. Police didn't search the hotel rooms before the warrant's issuance, or even enter them, as officers did in *Segura*. 468 U.S. at 800–01. Instead,

law enforcement officers maintained surveillance of the rooms[6] and awaited the search warrant. Doc. 61 at 4–5.  The Court in *McArthur* concluded that "preventing McArthur only from entering the trailer unaccompanied" was a "significantly less restrictive restraint" than searching the trailer, because officers "left his home and belongings intact[.]"  531 U.S. at 332.  Likewise here, officers exercised restraint and left Mr. Karagianis's "home and belongings intact" until the magistrate judge issued a search warrant.  *Id.*  Thus, this third circumstances also tips the scales in favor of holding any seizure here a reasonable one.

### 4. Duration and Diligence

That analysis leaves the fourth circumstance—the seizure's duration.  Mr. Karagianis argues that the government has failed to offer a "reasonable explanation why it took so long to obtain the search warrant in this case," and he suggests alternative, timelier means the officers could have employed.  Doc. 65 at 4.  He thus appears to question whether the seizure here meets the "temporary duration" requirement as well as the diligence requirement.  *Harris*, 2021 WL 5850891, at *13.  The court considers both expressions of this factor, in turn, below.

*First*, duration.  To be sure, case law has recognized that a seizure "reasonable at its inception may become unreasonable as a result of its duration."  *Shrum*, 908 F.3d at 1232 (citing *Segura*, 468 U.S. at 812).  But the length of time required to secure the search warrant here—at most 19 hours—is the same as the length of time required to secure *Segura*'s warrant.  468 U.S. at 812–13; *see also* Doc. 59 at 2.  And, there, the Court held the seizure reasonable, noting that a 19 hour delay "unfortunately is not uncommon," and concluding such a delay particularly likely

---

[6]  Mr. Karagianis disputes the exact nature of this surveillance, calling into question the likelihood that the surveillance was "constant."  Doc. 65 at 3.  But whether the surveillance was constant or intermittent seems of little relevance in determining that police made reasonable efforts to reconcile law enforcement needs with personal privacy demands.  In any case, police didn't enter or search the rooms before securing a warrant.

between 10 p.m. and 10 a.m. "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests." *Segura*, 468 U.S. at 812–13. Likewise, the delay here also spanned those "not as readily available" hours. *See* Doc. 59 at 1–2 (noting that police released Mr. Karagianis two hours after arrest, at approximately 6:15 p.m., on September 8, 2022, and executed the search warrant at 1:20 p.m. on September 9, 2022). In light of *Segura*, therefore, the duration at issue here doesn't upend a determination of reasonableness.

*Second*, diligence. The government provides considerable detail explaining the officers' diligence to secure a search warrant during those 19 hours. Law enforcement officers began drafting an affidavit to support a search warrant—as well as "affidavits in support of a complaint for Caballero's and Hidalgo's arrest"—after Ms. Hidalgo's interview. Doc. 61 at 5. Ms. Hidalgo's interview concluded at approximately 3:45 p.m. on September 8, 2022. *Id.* at 4. Officers submitted an initial affidavit draft to the U.S. Attorney's Office "at approximately 7:48 p.m." and a revised draft at 11:53 that same night. *Id.* at 5–6. And, at 10:23 a.m. on September 9, 2022, "an advance copy of the search warrant affidavit was emailed to the assigned Magistrate Judge's chambers." *Id.* at 6. Mr. Karagianis questions whether this account constitutes diligence, suggesting the government could have secured a search warrant more quickly from a Johnson County (Kansas) District Judge—were a federal magistrate judge unavailable—or could have sought a telephonic warrant. Doc. 65 at 4.

The court recognizes that officers have secured search warrants more quickly than the one at issue here and have done so during nighttime hours.[7] And the court acknowledges that

---

[7]   *See, e.g.*, *United States v. Billings*, 295 F. Supp. 2d 1222, 1224–25 (D. Kan. 2003) (explaining that an officer prepared a search warrant affidavit, found a judge, and got it signed within four hours, beginning the process at approximately 10:10 p.m. and executing the search warrant at approximately 3:30 a.m. the next morning).

using other methods might have proved speedier. But available, speedier methods don't translate unequivocally to a lack of diligence. *See Thomas v. United States*, 775 F. App'x 477, 491 (11th Cir. 2019) ("To be sure, with the benefit of hindsight, we can imagine other paths [the officer] might have pursued to secure a warrant more quickly—perhaps by seeking a federal warrant in the first instance. But that does not necessarily mean that [the officer's] conduct was unreasonable." (internal quotation marks, brackets, and citations omitted)). And law enforcement's conduct here aligns with diligence as evaluated by other courts.[8] To start, the circumstances required law enforcement to work not only on the hotel room search warrant, but also to complete affidavits for Ms. Caballero's and Ms. Hidalgo's arrest warrants. And officers worked on the search warrant affidavit late into the night. Finally, officers submitted more than one affidavit draft, indicating the kind of "considerable effort" other courts have found probative of diligence. *See United States v. Laist*, 702 F.3d 608, 617 (11th Cir. 2012) ("The record further reflects that [the officers] exchanged edits on the affidavit and warrant application in the weeks prior to submitting the application to the magistrate judge. The trial court further found that 'there [was] considerable effort that was put into the preparation of [the officers'] affidavit.'"). So, the court concludes law enforcement here sufficiently diligent in its efforts to secure a search warrant.

---

[8] *See, e.g.*, *United States v. Martinez*, 25 F.4th 303, 308–09 (5th Cir. 2022) (concluding officer was diligent under the circumstances—despite an eight-day delay securing a search warrant for a seized postal package—because the officer "was required to work on other cases, he took a sick day, and the delay included a weekend"); *United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012) (holding officer "sufficiently diligent"—under "the totality of the circumstances"—despite 25-day delay securing a search warrant for seized hard drives because the detailed affidavit demonstrated careful preparation, the officer's workload was very heavy, and the investigation was broad-ranging and complex); *Thomas*, 775 F. App'x at 491 (concluding officer was diligent despite 33-day delay in securing a search warrant for a seized computer because of his early and repeated efforts). The court recognizes these cases address the seizure of items instead of a hotel room/home. But the court reasons that the circumstances considered in assessing diligence are transferable, even if one's privacy interest in the seized property differs.

In sum, all four *McArthur* "circumstances" suggest a reasonable seizure here. And a reasonable seizure doesn't violate the Fourth Amendment. Mr. Karagianis thus lacks any basis to suppress evidence acquired under the search warrant.

### III.     Independent Source

The court could reach the same conclusion under an independent source theory. The above analysis already decides the motion, however. And to reach the independent source theory, the court must assume the officers' seizure—if one occurred—violated the Fourth Amendment. But it didn't (see the *McArthur* reasonableness analysis above). So, the court will linger here just long enough to review the independent source theory on these facts and Mr. Karagianis's arguments in reply.

"The independent source doctrine permits courts to admit evidence notwithstanding a prior illegality if law enforcement acquired the incriminating evidence from a separate, independent source." *Shrum*, 908 F.3d at 1235. The Supreme Court has held that a search warrant based on "information possessed by [officers] before" any constitutional violation may "constitute[] an independent source for the discovery and seizure of the evidence[.]" *Segura*, 468 U.S. at 814. That is, a search conducted under a valid warrant is "a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from" the constitutional violation. *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Here, the alleged constitutional violation—the hotel rooms' seizure after law enforcement released Mr. Karagianis on bond—contributed no new information used to secure the search warrant. Recall that officers began working on the search warrant affidavit directly after Ms. Hidalgo's interview, at approximately 3:45 p.m. on September 8, 2022. Doc. 61 at 4–5. And the alleged seizure period began—at the earliest—at 6:15 p.m. Doc. 59 at 2. So, officers had commenced writing the search warrant affidavit hours before the alleged seizure began. And no

16

new evidence emerged until after officers secured the search warrant and entered Mr. Karagianis's hotel rooms.  So, law enforcement based the search warrant on information they possessed before the seizure.  The search warrant here thus constitutes an independent source, "'sufficiently distinguishable' to purge the evidence of any 'taint' arising from" the seizure. *Segura*, 468 U.S. at 814 (quoting *Wong Sun*, 371 U.S. at 488).  Even if the alleged seizure did—somehow—constitute a Fourth Amendment violation, the independent source of the search warrant purges any taint.  And the court thus should deny Mr. Karagianis's motion, once again.

Replying to this search warrant as an "independent source" argument, Mr. Karagianis changes tack.  He doesn't argue that the search warrant wasn't an independent source—nor could he.  And he doesn't argue that the independent source theory doesn't apply on these facts—plainly, it does.  Instead, in a last-ditch effort, he argues that the search warrant here isn't supported by probable cause at all "but based only on a suspicion that the hotel rooms contained contraband." Doc. 65 at 5.  Mr. Karagianis doesn't explain the distinction he draws between probable cause and suspicion, nor does he support that distinction with case law.  And, even if he did, here's the thing: Mr. Karagianis didn't premise his Motion to Suppress on the warrant's invalidity.  He premised it on the taint injected by the allegedly unconstitutional seizure.  And the court already has rejected both the alleged seizure's unconstitutionality and its accompanying taint. So, that analysis should end the matter.

But, even when the court, out of abundant caution, reviews the magistrate judge's probable cause determination here, Mr. Karagianis's motion still fails.  Courts must show a high degree of deference to a magistrate judge's probable cause determination.  *See United States v. Reed*, 195 F. App'x 815, 822 (10th Cir. 2006) ("A reviewing court should accord great deference to a magistrate's determination of probable cause[.]").  That is, in a "doubtful or marginal case,"

the court submits to the issuing judge's probable cause determination. *Pulliam*, 748 F.3d at 971 (citation and internal quotation marks omitted). When a court reviews a warrant for probable cause, it must ensure that the issuing judge "had a substantial basis for concluding that probable cause existed." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (internal citation and quotation marks omitted). The court must decide whether the issuing judge, based on the supporting affidavit, rightly deciphered "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cotto*, 995 F.3d 786, 796 (10th Cir. 2021) (citation and internal quotation marks omitted).

Here, the magistrate judge determined probable cause existed, and made an appointment to swear out the warrant, in less than an hour.[9] And the court's review of probable cause in Part II.1. above—concluding the officers had probable cause to seize the hotel rooms—also suggests that Magistrate Judge James here "had a substantial basis for concluding that probable cause existed." *Sells*, 463 F.3d at 1154 (citation and internal quotation marks omitted). Recall that both Ms. Hidalgo's interview statements and the officers' corroborating observations of Mr. Karagianis's connections to the white Audi and the black Optima supported the officers' probable cause determination. The interview and the observations together, the court concludes, likewise indicate "a fair probability" that officers would find "contraband or evidence of a crime" at Mr. Karagianis's hotel rooms and so support Magistrate Judge James's probable cause determination. *Cotto*, 995 F.3d at 796 (citation and internal quotation marks omitted). And—even if the court deemed this case a "doubtful or marginal" one—it would still defer to Magistrate Judge James's assessment. *Pulliam*, 748 F.3d at 971.

---

[9] Law enforcement emailed an advance copy of the search warrant affidavit—the earliest opportunity for the magistrate judge to read it—at 10:23 a.m. on September 9, 2022, and Magistrate Judge James made an appointment to swear out the warrant at 11:01 a.m. Doc. 61 at 6.

In sum, the court concludes the independent source theory saves any secured evidence from suppression even if one assumes the alleged seizure violated the Fourth Amendment. And the court concludes that probable cause supports the warrant which provides that independent source. So, Mr. Karagianis's motion fails. There simply is no basis to suppress evidence here. With that conclusion in mind, the court explains its decision not to hold an evidentiary hearing.

**IV.        Foregoing an Evidentiary Hearing**

The court noted when recounting the facts in Part I that the parties dispute some factual details. And a factual dispute on a suppression motion typically entitles the defendant to an evidentiary hearing. But not always. And here, an evidentiary hearing wouldn't affect the court's analysis. Even taking all of Mr. Karagianis's facts as true, the motion fails. And so, the court elected to forego an evidentiary hearing, as explained below.

"A trial court is required to grant a suppression hearing only when a defendant *both* presents facts justifying relief and demonstrates disputed issues of material fact." *United States v. Windom*, No. 22-1077, 2023 WL 2136499, at *2 (10th Cir. Feb. 21, 2023) (emphasis added). In *Windom*, the Tenth Circuit affirmed a district court's decision to forego a suppression hearing where the court found an "absence of disputed facts and primary reliance on issues of law alone[.]" *Id.* *Windom* also held that "even if disputed facts were present on the face of the affidavit, the district court did not err in bypassing a suppression hearing." *Id.*

Here, the parties dispute some facts. *First*, they disagree about the alleged seizure's duration. The government contends it lasted 15 hours, Doc. 61 at 6, and Mr. Karagianis, 19 hours, Doc. 59 at 2. *Second*, they dispute whether Officer Daniels (or another Merriam Police Department officer) informed Mr. Karagianis that he couldn't return to his hotel rooms after his release on bond. Doc. 59 at 2; Doc. 61 at 7. And Mr. Karagianis argues that this second disputed fact alone "is sufficient to enable the court to conclude that a contested issue of fact is in

19

issue which requires an evidentiary hearing." Doc. 65 at 2. But even if an evidentiary hearing resolved all disputed facts in Mr. Karagianis's favor, he still wouldn't "present[] facts justifying relief[.]" *Windom*, 2023 WL 2136499, at *2. Indeed, in this Order, the court has resolved all facts in Mr. Karagianis's favor—taking the duration of the alleged seizure as 19 hours and assuming an officer did inform Mr. Karagianis that he couldn't return to his hotel rooms after his release. And even so, the court finds no basis to suppress evidence. If the facts—no matter how resolved—don't justify the relief of suppression, an evidentiary suppression hearing amounts to a waste of judicial and party resources. And so, the court elected to forego an evidentiary hearing, in keeping with Tenth Circuit precedent.

## V.     Conclusion

The court denies Mr. Karagianis's Motion to Suppress (Doc. 59). Even when the court assumes an officer told Mr. Karagianis not to return to his hotel rooms, and assumes this prohibition constitutes a seizure, the court concludes the seizure was reasonable. The alleged seizure thus didn't violate the Fourth Amendment or taint the evidence secured under the search warrant. And, even when the court assumes the alleged seizure violated the Fourth Amendment, the search warrant, as an independent source, purged the taint and protected the secured items from suppression. Because the court resolved all factual disputes in favor of Mr. Karagianis— and suppression still isn't justified—the court elected not to hold an evidentiary hearing.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Pavlos Karagianis's Motion to Suppress (Doc. 59) is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of February, 2024, at Kansas City, Kansas.**

                                                **s/ Daniel D. Crabtree**
                                                **Daniel D. Crabtree**
                                                **United States District Judge**